918 P.2d 1

**James L. STEWART and Bette Stewart,
Plaintiffs–Counterdefendants–
Appellees,**

v.

**J. Horace LUCERO and Julie Lucero,
Defendants–Counterclaimants–
Appellants.**

No. 22683.

Supreme Court of New Mexico.

May 14, 1996.

Donaldo A. Martinez, Las Vegas, for Appellants.

Stephen D. Bass & Associates, P.A., Stephen D. Bass, Albuquerque, for Appellees.

## OPINION

RANSOM, Justice.

1. James and Bette Stewart sued Horace and Julie Lucero for debt owing under a sales agreement whereby the Stewarts transferred a Sears Authorized Catalog Sales Merchant business to the Luceros and another couple. The Luceros counterclaimed with allegations of statutory and regulatory violations concerning disclosure and allegations of fraudulent representations that induced the Luceros to enter into the sales agreement. The trial court found that the Stewarts had made no material misrepresentations and that the Luceros owed the Stewarts $20,-225.69. The court entered judgment accordingly. The Luceros appeal pursuant to SCRA 1986, 12–102(A)(1) (Repl.Pamp.1992) (count sounding in contract). Because we conclude as a matter of law that the transfer of the catalog business gave rise to no special statutory or regulatory claims, and because we conclude there is substantial evidence supporting the trial court's express finding that the Stewarts made no material misrepresentations, we affirm.

2. *The agreement with the Stewarts.* On May 9, 1990, the Luceros, together with Joe and Marcella Coca who are not parties to this action, entered into a sales agreement with the Stewarts for the transfer of a Sears, Roebuck, and Co. catalog business located in Las Vegas, New Mexico. This transfer was subject to the approval of Sears. An addendum to the agreement, dated August 1, recites that the conditions agreed to by the parties had been met, the down payment had been tendered, and Sears had approved the transfer. Although Horace testified that he never saw this addendum, nor an assignment dated August 1 reciting Sears' consent to the transfer from James to Marcella, the addendum was signed by Horace's wife Julie as well as Marcella and the Stewarts. The purchase price was $70,000, and the Luceros and the Cocas each contributed $10,000 toward a $20,000 down payment. The Stewarts carried a promissory note at ten percent interest for the balance of $50,000 which was to be paid off by the Luceros and the Cocas over ten years in monthly installments of $660.75.

3. Before entering into the sales agreement, the Luceros met with the Stewarts to discuss the manner in which the Stewarts had conducted their business with Sears, and Horace reviewed the books and records of the catalog business. Horace also reviewed the contract between the Stewarts and Sears. In addition, the third provision of the sales agreement recites: "Buyer acknowledges having read and received a copy of the Franchise Agreement to be entered into between [Buyer] and Sears Company." The referenced "Franchise Agreement" was an exemplar of the merchant agreement under which the Luceros and Cocas operated the catalog business. The actual agreement recites that "THIS AGREEMENT is made between Marcella Coca (hereinafter referred to as 'Merchant') and Sears, Roebuck, and Co." and provides that "Merchant is appointed by Sears to operate one Sears Catalog merchandise facility within the following described nonexclusive territory: (Zip Code 87701)."

4. The Luceros and Cocas took over the catalog business as of August 1, 1990. On January 25, 1993, Sears announced its intention to cease all catalog business by the end of the year. Sears notified the Luceros and the Cocas of this intention by memorandum. As part of the shut down, Sears promised to pay each catalog business operator ten percent of his or her 1991 or 1992 net sales, whichever value was higher, in exchange for a release of claims. Over objections by the Luceros, Marcella accepted Sears' offer, and

the catalog business was closed in June 1993. This appeal raises no issue regarding any claims the Luceros may have against Marcella for breach of any duty owed by her as a joint venturer.

5. *The merchant agreement with Sears.* Under the merchant agreement the Merchant was required to pay directly to Sears— no later than the next business day following receipt—all payments for orders, payments on credit previously extended by Sears, payments made on C.O.D. deliveries, and other such payments. Sears would then remit a commission on or before the twelfth calendar day of each month. This commission was calculated at a rate of ten and one half percent of net sales for the first $300,000 in sales made during the calendar year and ten percent of all sales in excess of $300,000. The arrangements under which the Luceros and Cocas operated the catalog business were neither argued nor demonstrated to differ in any material respect from the arrangements under which the Stewarts had operated it.

6. As for Sears' regulation of the business, the location of the business was subject to Sears approval, store hours had to be established in conformity with the practice of other businesses in the Las Vegas community, equipment designated by Sears had to be used for the purpose of transmitting orders, and displayed merchandise had to be in quantities determined by Sears. Sears required the Luceros and Cocas to keep documentation of receipts, inventory, distribution, and refunds for review by Sears, and to maintain insurance coverage for general commercial liability (covering bodily injury, property damage, etc., arising from operation of the Las Vegas store), vehicle liability insurance, and workers' compensation insurance. Sears agreed to provide consulting services to the Luceros and Cocas "relating to product knowledge and promotions." The Luceros and Cocas retained discretion over personnel and could advertise within their assigned territory "subject to Sears control of its trade names and trademarks."

7. Like the Stewarts before them, the Luceros and Cocas could not assign their merchant agreement without the approval of Sears. They were permitted under the agreement to engage in business other than the sale of Sears catalog merchandise, with the exception of businesses involving the sale of "catalog merchandise through other than Sears catalogs." Upon termination or expiration of the agreement, the Luceros and Cocas agreed to "immediately discontinue the use ... of any and all Sears or Sears owned trade names or trademarks."

8. *The issues.* The Luceros' primary contentions are that (1) the Stewarts misrepresented the value of the business, and (2) the Stewarts had agreed to transfer the catalog business to both the Luceros and the Cocas, but, unbeknownst to the Luceros, an assignment document and the merchant agreement were in Marcella's name only. They posit two statutory or regulatory grounds upon which they should be allowed to avoid or rescind the sales agreement. First, they claim violations of New Mexico Uniform Commercial Code—Sales. *See* NMSA 1978, §§ 55–2–101 to –725 (Repl. Pamp.1993 & Cum.Supp.1995).[1] Second, they contend that the Stewarts did not disclose information as required under Federal Trade Commission (FTC) regulations. *See* Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures, 16 C.F.R. § 436 (1995). Related to each of these two grounds is the Luceros' contention that the sales agreement involved the sale of a franchise.

9. *Article 2 of the New Mexico Uniform Commercial Code does not apply to the sale of a business as a going concern.* The Luceros contend that the Stewarts breached duties of good faith and fair dealing imposed by the New Mexico Uniform Commercial Code. *See* NMSA 1978, § 55–1–102(3) (Repl.

---

1. In the trial court the Luceros also argued that they were entitled to relief under provisions of the New Mexico Uniform Commercial Code—Secured Transactions. *See* NMSA 1978, §§ 55–9–101 to –507 (Repl.Pamp.1987 & Cum.Supp. 1995). The Luceros have provided no argument or authority on this issue in this Court and as such we will not consider it. *See State v. Sandoval,* 88 N.M. 267, 270, 539 P.2d 1029, 1032 (Ct.App.1975) (points of error identified in the statement of proceedings but neither briefed nor supported by authority considered abandoned).

Pamp.1993) (stating that "the obligations of good faith, diligence, reasonableness and care prescribed by this act may not be disclaimed"); NMSA 1978, § 55–1–201(19) (Repl.Pamp.1993) (" 'good faith' means honesty in fact in the conduct or transaction concerned"); NMSA 1978, § 55–1–203 (Repl. Pamp.1993) (stating that "[e]very contract or duty within this act ... imposes an obligation of good faith in its performance or enforcement"). While we do not perceive any remedy available under the Uniform Commercial Code that is not available under the common law, we do note that various courts have considered whether the sale of a business involves a transaction in goods within the meaning of Uniform Commercial Code, Article 2. *See generally* Sonja A. Soehnel, Annotation, *What Constitutes "Goods" Within the Scope of UCC Article 2,* 4 A.L.R.4th 912, 921–24 (1981). Section 55–2–102 of the New Mexico Uniform Commercial Code—Sales states that "[u]nless the context otherwise requires, this article applies to transactions in goods." Goods are further defined as

> all things ... which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (Article 8) and things in action. "Goods" also includes the unborn young of animals and growing crops and other identified things attached to realty as described in the section on goods to be severed from realty.

NMSA 1978, § 55–2–105(1) (Repl.Pamp.1993) (citation omitted).

10. The Luceros contend that the New Mexico Uniform Commercial Code applies here because distributorship agreements are governed by Article 2. For support, they rely on *United Wholesale Liquor Co. v. Brown–Forman Distillers Corp.,* 108 N.M. 467, 470, 775 P.2d 233, 236 (1989). In making this argument the Luceros equate franchises and distributorships. In *Brown–Forman* this Court held that an agreement under which United was authorized to distribute certain lines of Brown–Forman products in northern New Mexico "should be subject to the provisions of the UCC." *Id.* Essential to our holding was the observation that "[t]he purpose of distributorship agreements is to provide a contract for the sale of a product from a manufacturer at wholesale prices that is to be marketed in a specific area by the distributor." *Id.* Because an agreement for the sale of alcoholic beverages is an agreement for the sale of goods, it would be governed by Article 2. Not all franchises are distributorships. More importantly, not all distributorship agreements will involve the sale of goods. *Brown–Forman* should not be understood to hold that all distributorship agreements, including those which do not involve the sale of goods, will nevertheless be governed by Article 2 of the Uniform Commercial Code.

11. In New Mexico we apply the "primary purpose" test to determine whether a mixed contract is governed by the Uniform Commercial Code. *Kirkpatrick v. Introspect Healthcare Corp.,* 114 N.M. 706, 709–10, 845 P.2d 800, 803–04 (1992) (concluding that Article 2 did not apply to contract between interior designer and healthcare corporation). Those jurisdictions applying a similar test to contracts like the one at issue here routinely have concluded that the Uniform Commercial Code does not apply. *See, e.g., Dravo Corp. v. White Consol. Indus., Inc.,* 602 F.Supp. 1136, 1140–41 (W.D.Pa.1985) (reasoning that two assets which were not goods—a five-year non-competition agreement and drawings and tracings—accounted for over half of the purchase price of the business) (applying Pennsylvania law); *McFadden v. Imus,* 192 Mich.App. 629, 481 N.W.2d 812, 813–14 (1992) (reasoning that of a $75,000 contract price, "less than one-third" possibly could be attributed to consideration paid for goods belonging to an automobile dealership); *D.G. Porter, Inc. v. Fridley,* 373 N.W.2d 917, 924 (N.D.1985) (holding that North Dakota Uniform Commercial Code sales provisions did not apply to sale of bar business because essential elements of sale involved nongoods such as goodwill, transfer of liquor license, assignment of lease of business premises, and transfer or assignment of insurance policies and contracts related to business).

12. Applying the primary purpose test here, we conclude that a sale such as this

one, involving the transfer of a business as a going concern, is not a transaction in goods. The sale of any business may involve the transfer of goods in the form of inventory, office equipment, and other movables. *See Miller v. Belk*, 23 N.C.App. 1, 207 S.E.2d 792, 794 (1974) (concluding that sale of laundry was transaction in goods because "in reality nothing more than a sale of the equipment, furniture, and other movables" occurred). In this case, however, any such transfer was merely incidental. The record discloses that Sears Catalog Sales Merchants retained no inventory other than a few display items and customer orders waiting to be picked up. Further, the sales agreement and the merchant agreement demonstrate that the basis of the Luceros' and Cocas' bargain with the Stewarts was the right to operate a catalog business using the Sears name and a noncompetition agreement from the Stewarts. These items are nongoods, and therefore Article 2 of the New Mexico Uniform Commercial Code is inapplicable. *Cf. Fridley*, 373 N.W.2d at 924.

■ 13. *Federal franchise disclosure requirements do not apply to this type of sale.* The Luceros claim entitlement to rescission for per se violations of federal disclosure requirements found in FTC regulations. These regulations apply to "franchisors" and "franchise brokers" as those terms are defined in Section 436.2. 16 C.F.R. § 436.1 (stating that "it is an unfair or deceptive act or practice ... *for any franchisor or franchise broker*" to fail to provide disclosures enumerated in Section 436.1 (emphasis added)). Section 436.2(c) defines a franchisor as "any person who participates in a franchise relationship as a franchisor, as denoted in paragraph (a) of this section [defining franchise]." The FTC regulations define a "franchise" as follows:

The term *franchise* means any continuing commercial relationship created by any arrangement or arrangements whereby:

(1)(i)(A) a person (hereinafter "franchisee") offers, sells, or distributes to any person other than a "franchisor" (as hereinafter defined), goods, commodities, or services which are:

(1) Identified by a trademark, service mark, trade name, advertising or other commercial symbol designating another person (hereinafter "franchisor"); or

(2) Indirectly or directly required or advised to meet the *quality standards prescribed by another person* (hereinafter "franchisor") where the franchisee operates under a name using the trademark, service mark, trade name, advertising or other commercial symbol designating the franchisor; and

(B)(1) The *franchisor exerts or has authority to exert a significant degree of control over the franchisee's method of operation*, including but not limited to, the franchisee's business organization, promotional activities, management, marketing plan or business affairs; or

(2) The franchisor gives significant assistance to the franchisee in the latter's method of operation, including, but not limited to, the franchisee's business organization, management, marketing plan, promotional activities, or business affairs; ... or

(ii)(A) A person (hereinafter "franchisee") offers, sells, or distributes to any person other than a "franchisor" (as hereinafter defined), goods, commodities, or services which are:

(1) Supplied by another person (hereinafter "franchisor"), or

(2) Supplied by a third person (e.g., a supplier) with whom the franchisee is *directly or indirectly required to do business by another person* (hereinafter "franchisor"); or

(3) Supplied by a third person (e.g., a supplier) with whom the franchisee is *directly or indirectly advised to do business by another person* (hereinafter "franchisor") where such third person is affiliated with the franchisor; and

(B) The *franchisor:*

(1) Secures for the franchisee *retail outlets or accounts* for said goods, commodities, or services; or

(2) Secures for the franchisee *locations or sites for vending machines, rack displays, or any other product sales display*

used by the franchisee in the offering, sale, or distribution of said goods, commodities, or services; or

*(3) Provides* to the franchisee the *services of a person able to secure the retail outlets, accounts, sites or locations* referred to in paragraph (a)(1)(ii)(B)(1) and (2) of this section; and

(2) The franchisee is required as a condition of obtaining or commencing the franchise operation to make a payment or a commitment to pay to the franchisor, or to a person affiliated with the franchisor.

16 C.F.R. § 436.2(a) (first emphasis in original, subsequent emphasis added). Section 436.2(j) defines a franchise broker as "any person *other than a franchisor or franchisee* who sells, offers for sale, or arranges for the sale of a franchise." (Emphasis added.)

14. The particular name the Stewarts and the Luceros chose to give to the relationship between the Luceros and Sears is not determinative of whether a franchise relationship exists within this definition.[2] Final Guides to the Franchising and Business Opportunity Ventures Trade Regulation Rule § IA, 44 Fed.Reg. 49966 (1979). In any event, if, as the Luceros claim, the sale here involved a franchise, the disclosure requirements in the FTC regulation do not apply to the Stewarts because they were neither franchisors nor franchise brokers; they were franchisees. *See* Section 436.2(j) (defining franchise broker). Therefore, the fact that the Stewarts did not provide all disclosures required by the FTC franchising rule is not a basis upon which the Luceros may rescind or avoid the sales agreement.

■ 15. *New Mexico common law of contracts—not franchise law—must be relied upon by the Luceros to avoid or rescind the sales agreement.* In support of their claim

that the sales agreement involved the sale of a franchise the Luceros primarily rely on the designation of the catalog business as a "franchise" in the sales agreement. The Stewarts counter that the Sears merchant agreement under which they had operated, and which the Luceros reviewed prior to entering into the sales agreement, establishes that Sears catalog business operators were independent contractors. We do not decide, however, whether the business purchased by the Luceros and Cocas was a franchise under New Mexico law. As it currently stands, New Mexico has no disclosure requirements applicable to the sale, transfer, or assignment of a franchise. Therefore, the Luceros must rely on the common law of contracts for the requested relief.

■ 16. The Luceros' common-law claims against the Stewarts are for fraud and misrepresentation. First, the Luceros contend that the Stewarts misrepresented the value of the catalog business as evidenced by the fact that as a shut-down payment Sears paid to Marcella Coca $65,844.00, a sum which was less than the price the Luceros and Cocas paid the Stewarts for the business. The Luceros also contend the Stewarts represented that the catalog business would continue long-term. Lastly, the Luceros contend the Stewarts failed to disclose that the merchant agreement would only be in Marcella's name when they had agreed to transfer the business to the Luceros' and the Cocas jointly.

17. Depreciation in the value of the business and the possibility that the business might not continue were risks that the Luceros assumed when they chose to enter the sales agreement. The trial court found that "[a]s of the date of the execution of the Sales Agreement and Addendum to Sales Agreement, none of the parties hereto were aware

**2.** A provision of the merchant agreement between Sears and its catalog business operators stated that "[i]t is the intention of the parties hereto that the Merchant act as an independent contractor. No partnership, joint venture, agency or employment is intended." Just as the designation in the sales agreement between the Stewarts and the Luceros is not determinative, so too this provision of the merchant agreement is not determinative. Final Guides to the Franchising and Business Opportunity Ventures Trade

Regulation Rule § IA, 44 Fed.Reg. 49966 (1979); *see also Neptune T.V. & Appliance Serv. v. Litton Microwave Cooking Prods. Div.*, 190 N.J.Super. 153, 462 A.2d 595, 598 (App.Div.1983) (stating that "franchise restrictions against representation by the franchisee of agency or employee status are not atypical of franchise agreements and are in fact consistent with the legal independence of the franchisee which is regarded as an essential element of the franchise relationship").

of the fact that Sears would cease its catalog sales business in the year 1993." This finding is supported by substantial evidence. Hence, the Luceros' claims for misrepresentation of the value of the business and its long-term prospects must fail.

18. The Luceros claim that they should be allowed to avoid or rescind the sales agreement because the Stewarts failed to disclose that the merchant agreement was only in Marcella Coca's name. This claim must also fail. The record discloses that a year before Sears announced its intention to discontinue its catalog business the Luceros knew that their names did not appear on the merchant agreement with Sears. At no time after that discovery did the Luceros complain to the Stewarts or seek to get their money back. In fact, the Luceros continued to make installment payments pursuant to the sales agreement, continued to receive their share of the monthly commission checks from Sears, and benefitted equally with the Cocas in the final buyout from Sears. Thus there is substantial evidence that the Luceros ratified the contract and waived any objections they might have had. *Putney v. Schmidt*, 16 N.M. 400, 411, 120 P. 720, 723 (1911) (stating that party who discovers fraud and thereafter takes steps in affirmance of contract will be deemed to have affirmed it). No case has been made that, by the assignment document reciting Sears' consent to the transfer from James to Marcella alone, the Stewarts did not in fact or in law comply with the sales agreement of May 9. The Luceros do not claim, for example, that Marcella was acting other than for the joint interests of the Luceros and the Cocas. There is no evidence that the Luceros were denied their interest in the business. Nor did Marcella at any time act as if she were a sole proprietor.

19. *Conclusion.* The sale of a business as a going concern is not a transaction in goods, and therefore the New Mexico Uniform Commercial Code—Sales does not apply here. Similarly, federal franchise disclosure requirements also do not apply. Finally, because New Mexico franchise law does not require persons in the Stewarts' position to make disclosures to prospective purchasers, New Mexico franchise law is in-

applicable to this case, and the Luceros must rely upon the common law of contracts. We find that substantial evidence supports the trial court's conclusion that the Stewarts made no material misrepresentations for purposes of inducing the Luceros to enter the sales agreement. Accordingly, there is no basis to avoid or rescind the contract. We therefore affirm.

20. **IT IS SO ORDERED.**

FROST, C.J., and MINZNER, J., concur.