The PEOPLE of the State of Colorado, Complainant,

v.

Wiley T. LINVILLE, Respondent.

No. 04PDJ089.

Office of the Presiding Disciplinary Judge of the Supreme Court of Colorado.

April 27, 2005.

On March 1, 2005, WILLIAM R. LUCERO, the Presiding Disciplinary Judge ("PDJ" or "the Court"), conducted a Sanctions Hearing pursuant to C.R.C.P. 251.18(d). James S. Sudler appeared on behalf of the Office of Attorney Regulation Counsel ("the People"). Wiley T. Linville ("Respondent") did not appear, nor did counsel appear on his behalf. The PDJ issues the following Report:

**REPORT, DECISION, AND ORDER IMPOSING SANCTIONS PURSUANT TO C.R.C.P. 251.15(b)**

*SANCTION IMPOSED: ATTORNEY DISBARRED*

### I. ISSUE

Disbarment is the presumed sanction when a lawyer acting in a fiduciary capacity converts money entrusted to him. Respondent, as a trustee, took $73,000 from a trust without the beneficiaries' consent. When the beneficiaries discovered his actions, Respondent claimed that he had made a mistake. Later, when confronted with disciplinary action, he claimed that he had provided the trust with a promissory note before removing the funds. Respondent has no prior discipline and has completed restitution. Is disbarment nevertheless appropriate?

### II. PROCEDURAL HISTORY AND BACKGROUND

On September 22, 2004, the People initiated this action by filing a Complaint against Respondent (attached as Exhibit A). The Complaint was served upon Respondent via certified mail on that day. On September 29, 2004, F. Michael Ludwig, attorney for Respondent, filed an Acceptance of Service on his behalf. However, according to the People, Mr. Ludwig withdrew from the representation. Therefore, on October 14, 2004, the People filed an Amended Citation. On October 26, 2004, the People filed proof of service pursuant to C.R.C.P. 251.32(b), showing re-service of the Amended Citation and Complaint via certified mail.

On November 10, 2004, after Respondent failed to answer the Complaint, the People filed a Motion for Default. On December 10, 2004, the PDJ granted the People's Motion for Default on all claims. Upon entry of the default, all facts in the Complaint are deemed admitted and all rule violations in the Complaint are deemed established. *People v. Richards,* 748 P.2d 341 (Colo.1987). Claim I involves Colo. RPC 8.4(c) (conduct involving dishonesty, fraud,

deceit or misrepresentation), and Claim II involves Colo. RPC 1.7(b) (representing a client when the representation of that client may be materially limited by the lawyer's own interests) and Colo. RPC 1.8(a) (entering into a business transaction with a client adverse to the client's interests). However, at the Sanctions Hearing on March 1, 2005, the People moved to dismiss Claim II, a motion granted by the PDJ. Thus, the only issue to be decided is the appropriate sanction for Respondent's violation of Colo. RPC 8.4(c).

While the People sent Respondent notice of the Sanctions Hearing, Respondent did not appear. The People presented no witnesses. The People introduced and the PDJ admitted three exhibits: 1) the Deputy Clerk of the Supreme Court's certification of Respondent's attorney registration status and listed addresses, 2) a photocopy of a promissory note executed by Respondent and dated June 5, 2003, and 3) a photocopy of a promissory note executed by Respondent and dated July 15, 2003.

The People seek disbarment. Upon consideration of the facts established by the entry of default, the exhibits offered and admitted, and the People's argument for disbarment, and after weighing all the relevant factors, the PDJ finds that disbarment is the appropriate sanction.

### III. FINDINGS OF FACT

Respondent has taken and subscribed the oath of admission, was admitted to the bar of this Court on May 16, 1990, and is registered upon the official records of this Court, registration number 19373. He is therefore subject to the jurisdiction of this Court in these disciplinary proceedings. Respondent's registered business address is 400 S. Colorado Blvd., no. 510, Denver, CO 80246.

The factual background in this case is fully detailed in the admitted Complaint, which is hereby adopted and incorporated by reference.[1] In summary, Respondent drafted a charitable trust ("the Trust") in 1996 for Paul and Mary Lillmars, a couple with whom he had an ongoing attorney-client relationship.

---

1. The Complaint is attached to this Report as Exhibits A.

During their lives, the Lillmars are the income beneficiaries of the Trust. Upon their deaths, the trust funds will go to charity.

Initially, the Trust held a piece of real estate. In June 2003, Respondent represented the Trust in selling the real estate for $317,000. At the closing, Respondent was named trustee of the Trust funds. As trustee, Respondent deposited all of the sale proceeds into an account ("the Trust Account"). One day later, Respondent began withdrawing funds for his own personal use. In total, Respondent withdrew about $73,000 in Trust funds for his own purposes, including his personal home mortgage, his firm's operating account, his children's trusts, and a large payment on a Mercedes.

On July 11, 2003, Respondent met with Mr. Lillmars, investment advisor Albert Woodward, and accountant Roseanne Masters to discuss the investment of $300,000 into a real estate investment trust. At the time of the meeting, the Trust had a balance of about $267,000. At this meeting Respondent, did not disclose either the Trust Account balance or that he had taken money from the Trust for his own use.

Even after the meeting at which Respondent did not discuss his withdrawal of Trust funds, Respondent continued to take large amounts from the Trust Account for his own benefit.[2] On July 15, 2003, Respondent deposited about $58,000 back into the Trust Account. After that deposit, the Trust had sufficient funds to complete the planned investment, which was done the next day. Respondent, however, still owed about $15,000 plus interest as of July 16, 2003.

Ms. Masters, in preparation of the Trust's taxes, discovered in March 2004 that Respondent had withdrawn substantial amounts of money from the Trust. In May 2004, Ms. Masters and the Lillmars' son Greg Lillmars met with Respondent. Respondent said that he had made a mistake, and when he realized that he was using the wrong account, he replaced the money. At that time, Respondent wrote a post-dated check for $15,486.38, to complete restitution. This check cleared when presented.

Although he initially stated that his use of Trust funds was a mistake, Respondent stated that he had received a loan from the Trust in response to the People's investigation. He produced a copy of an unsecured promissory note for $74,000, signed by himself and dated June 5, 2003. There is no provision for payment amounts and no due date for payment in full. Respondent told the People that he paid the $74,000 note in full on July 15, 2003, which he noted on its face. He claims he did so by depositing $58,000 into the Trust and executing a second promissory note for $15,000. With the exception of the dates and the amount, the second promissory is identical to the first. Respondent stated that before he took the money from the Trust, he had "outlined" that he would need about $74,000 in cash during a 45–day period. However, Respondent never discussed his personal use of Trust funds with anyone at the time he took the money.

These facts constitute a violation of Colo. RPC 8.4(c) (conduct involving dishonesty, fraud, deceit or misrepresentation), as Respondent converted Trust funds for his own personal use, and then concocted a story about a loan in order to conceal his conversion.

## IV. SANCTIONS

The ABA Standards for Imposing Lawyer Sanctions (1991 & Supp.1992) ("ABA *Standards*") and Colorado Supreme Court case law are the authorities for selecting and imposing sanctions for lawyer misconduct. The appropriate sanction depends upon the facts and circumstances of each case.

### Analysis Under the ABA *Standards*

■ Disbarment is generally appropriate "when a lawyer knowingly converts client property and causes injury or potential injury to a client," ABA Standard 4.11, or "when a lawyer engages in conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice law," ABA Standard

---

**2.** Respondent withdrew $20,900 of the $73,000 total on July 14, 2003.

5.11(b).[3] Therefore, disbarment is the presumptive sanction for Respondent's misconduct. However, before determining the appropriate sanction, ABA *Standard* 3.0 directs the PDJ to examine the following factors:

(1) the duty breached;

(2) the mental state of the lawyer;

(3) the injury or potential injury caused; and

(4) the aggravating and mitigating evidence.

## A. DUTIES VIOLATED

First and foremost, Respondent violated his fiduciary duties as trustee, and thus violated his duties to both present and future beneficiaries of the Trust. As part of an ongoing attorney-client relationship, the Lillmars sought Respondent's counsel in creating and managing the Trust. Respondent failed to act with integrity and abused his position when he treated Trust funds as though they were his own, and then attempted to conceal his wrongdoing from the Lillmars and the People. Because Respondent violated legal duties, he also breached his duty to the public and the legal profession. "Attorney misconduct perpetuates the public's misperception of the legal profession and breaches the public and professional trust." *In re DeRose*, 55 P.3d 126, 131 (Colo.2002) (paraphrasing *In re Pautler*, 47 P.3d 1175, 1178 (Colo.2002)).

## B. MENTAL STATE

Due to the fact that Respondent defaulted in this action, the Court is limited to the Complaint in determining Respondent's state of mind. The Complaint supports a finding that Respondent knowingly converted client funds. According to the ABA *Standards*, " 'knowledge' is the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result." [4] Here, Respondent acted with the *conscious purpose* of taking trust money for his own benefit. As pleaded in the Complaint, Respondent had "outlined" his personal cash needs and took approximately that amount from the trust.

## C. INJURY

Although their testimony would have been helpful in determining the nature and extent of any injury, the Lillmars were not called as witnesses at the Sanctions Hearing. Therefore, the PDJ must rely solely on the facts in the Complaint. Respondent has made full restitution to the Lillmars.[5] Nevertheless, the Complaint demonstrates a potential financial injury to them.[6] In addition, the Lillmars were injured in an intangible way by the serious breach of integrity. Repayment of the money has ameliorated the monetary loss, but it cannot repair the loss of confidence in the profession and the legal system.

## D. AGGRAVATING AND MITIGATING FACTORS

### 1. MATTERS IN AGGRAVATION, ABA *Standard* 9.2

**Dishonest or Selfish Motive**

Respondent acted dishonestly and with a selfish motive. The Complaint establishes that he misappropriated approximately $73,000 for his own benefit. Respondent used Trust money to pay for his own bills, including his house, his car, and his law firm. He even deposited money from the Lillmars' Trust into his own children's trust accounts. Although Respondent returned the funds, he did not make a payment until he was forced

---

**3.** Under ABA *Standard* 4.12 (Commentary), "[s]uspension should be reserved for lawyers who engage in misconduct that does not amount to misappropriation or conversion," such as commingling funds of failing to return funds promptly.

**4.** ABA *Standards for Imposing Lawyer Sanctions* III. Black Letter Rules: *Definitions*.

**5.** At the Sanctions Hearing, the People did mention lost interest in their argument for disbarment. However, the People did not present any evidence in this respect.

**6.** For example, if Respondent had not been able to return enough money in time, the Lillmars may not have been able to make the desired real estate investment.

to so as a practical matter. Had Respondent not deposited $58,000 when he did, it would have been immediately apparent that he had converted Trust funds because of the planned $300,000 investment. When Ms. Masters discovered his actions, Respondent explained that he had mistakenly taken money out of the wrong account. Later, Respondent stated that he had received a loan from the Trust and presented the promissory notes. However, the Court finds the loan story to be untruthful for three reasons: 1) Respondent changed his original explanation that it was a mistake, 2) Respondent never discussed taking money out of the Trust for his own benefit at the time he took the money, and 3) the promissory notes themselves are suspect, as they are unsecured and do not contain a due date. Thus, Respondent attempted to conceal his wrongdoing, but his deception only exacerbated it.

## Vulnerability of Victim

The People argue that Respondent's actions are aggravated by the vulnerability of his victims. However, the People did not present any evidence (such as age, mental capacity, or poverty) that make the Lillmars particularly vulnerable. Nor did the People present any evidence on the future beneficiaries, the charities. As with every victim in this system, the Lillmars placed their trust in an attorney and relied on his counsel in managing their affairs. Respondent breached that trust. However, the Court cannot find, for the purposes of aggravating Respondent's offense, that the Lillmars were vulnerable.

## Deceptive Practices During the Disciplinary Process

Respondent presented two promissory notes to the People, claiming that these promissory notes prove the existence of a loan and disprove any intent to misappropriate money from the Trust. Respondent's explanation regarding when and why he drafted the promissory notes defies reason and common sense. The clear and convincing evidence based upon facts in the Complaint and the promissory notes themselves is that Respondent never in-

tended for anyone to find out that he took $73,000 from the Trust. When his actions were first discovered, he asserted that it had been a mistake, not that he had been given a loan. Absent some plausible explanation from Respondent, the Court is left with the inference that Respondent drafted and produced the promissory notes after the People's investigation commenced.

## Substantial Experience in the Law

Respondent has approximately 15 years of experience as a lawyer, and is (or should be) well aware of his ethical responsibilities and fiduciary duties. The extent of his experience makes Respondent's breach of his responsibilities and duties even more egregious.

## 2. MATTERS IN MITIGATION, ABA Standard 9.3

### Absence of a Prior Disciplinary Record

Respondent has no disciplinary history. He has been licensed in Colorado since May 16, 1990.

### Timely Good Faith Effort to Make Restitution/Rectify Consequences of Misconduct

Respondent returned all of the money he took from the Trust Account and did so before serious harm could occur, thus alleviating the injury and potential injury caused. Respondent must be given credit for completing restitution before the People initiated an investigation and filed formal charges. However, the Court must also consider that payment of restitution was motivated at least in part by Respondent's effort to avoid detection, and not necessarily in a good faith effort to acknowledge his wrongdoing.

### Analysis Under Case Law

Knowing conversion in the context of client money "consists simply of a lawyer taking a client's money entrusted to him, knowing that it is the client's money and knowing that the client has not authorized the taking." *People v. Varallo*, 913 P.2d 1, 11 (Colo.1996) (quoting *In re Noonan*, 102 N.J. 157, 506 A.2d 722, 723 (N.J.1986)). Neither the lawyer's motive in taking the money, nor the lawyer's intent regarding whether

the deprivation is temporary or permanent, are relevant for disciplinary purposes. *Id.* at 10–11. In accepting disbarment for an attorney who converted funds while acting as conservator, the Colorado Supreme Court stated:

> We have repeatedly held that a lawyer's knowing misappropriation of funds, whether belonging to a client *or third party,* warrants disbarment except in the presence of extraordinary factors of mitigation.... The fact that the respondent has not been previously disciplined does not call for a lesser sanction ... and the record before us presents no factors in mitigation.

*People v. Dice,* 947 P.2d 339, 340–341 (Colo. 1997) (emphasis added) (citing, *inter alia, People v. Motsenbocker,* 926 P.2d 576, 577 (Colo.1996) (lawyer disbarred for knowing misappropriation of bar association funds)).

 Despite the presumption of disbarment in conversion cases, the Supreme Court has reminded disciplinary authorities not to overlook significant mitigating factors that may overcome the presumption. *In the Matter of Fischer,* 89 P.3d 817 (Colo.2004). Thus, it is incumbent upon the PDJ to properly consider evidence in mitigation, and to recognize that each case presents unique facts and perhaps a different need for sanctions.

In *Fischer,* the Court disapproved disbarment. That case, however, did not involve taking trust money for personal use. Rather, the attorney had deviated from a separation agreement disbursement schedule without first obtaining court approval. Mitigating factors included the lack of an attempt to falsify, deceive or conceal the misconduct. In addition, the attorney accepted personal responsibility for all debts subject to the separation agreement and all additional expenses. Finally, the Court believed that, while the attorney admitted knowingly misappropriating third party funds, he thought he was simply attempting to overcome hurdles in liquidating assets and it had not occurred to him that he was violating a court order. *Fischer* is thus readily distinguishable from cases in which the at-torney flagrantly abuses his duties by treating trust funds as his own. *Id.* at 821.

This is not a case in which Respondent acted negligently in handling the Trust. Rather, acting as trustee, he consciously used trust funds for his own purposes. Moreover, Respondent did not act openly, readily admit his misconduct, or express remorse. In fact, Respondent tried to conceal his wrongdoing by fabricating promissory notes in support of a purported loan.

## V. CONCLUSION

Although Respondent failed to appear and present evidence in mitigation, Respondent has no prior discipline and he did complete restitution to the Trust. However, upon consideration of the fiduciary duties violated, the amount misappropriated (approximately $73,000), Respondent's knowing mental state, his selfish motive, his dishonest attempts to conceal his actions, and his substantial experience in the practice of law, the PDJ finds that disbarment, and not suspension, is the appropriate discipline.

One of the primary goals of our disciplinary system is to protect the public from lawyers who pose a danger to them. The Lillmars entrusted funds to Respondent. Acting as trustee of those funds, Respondent knowingly converted them in order to pay for his own expenses. This raises a substantial question regarding the danger Respondent poses to the public in the practice of law. Respondent has shown a serious lack of integrity, and his misconduct adversely reflects on his fitness to practice law. The PDJ finds that a sanction short of disbarment would contravene the Court's duty to protect the public.

## VI. ORDER

It is therefore ORDERED:

1. WILEY TODD LINVILLE, attorney registration number 19373, is DISBARRED from the practice of law, effective thirty-one (31) days from the date of this Order, and his name shall be stricken from the list of attorneys licensed to practice law in the State of Colorado.

2. WILEY TODD LINVILLE is OR-DERED to pay the costs of this proceeding; the People shall submit a Statement of Costs within fifteen (15) days of the date of this Order. Respondent shall have ten (10) days within which to respond.

## EXHIBIT A

Case Number: 04PDJ089

JAMES S. SUDLER, # 08019, Assistant Regulation Counsel, John S. Gleason, # 15011, Regulation Counsel, Attorneys for Complainant, 600 17th Street, Suite 200–South, Denver, Colorado 80202.

## COMPLAINT

THIS COMPLAINT is filed pursuant to the authority of C.R.C.P. 251.9 through 251.14, and it is alleged as follows:

### *Jurisdiction*

1. The respondent has taken and subscribed the oath of admission, was admitted to the bar of this court on May 16, 1990, and is registered upon the official records of this court, registration no. 19373. He is subject to the jurisdiction of this court in these disciplinary proceedings. The respondent's registered business address is 400 S. Colorado Blvd. # 510, Denver, CO 80246.

### CLAIM I

#### [Colo. RPC 8.4(c) ]

2. The respondent engaged in conduct involving dishonesty in violation of Colo. RPC 8.4(c) by converting funds he held as trustee to his own use.

3. Respondent has had an on-going attorney client relationship with Paul and Mary Lillmars.

4. Respondent drafted a charitable trust for Mr. and Ms. Lillmars in 1996 (the "Trust"). The income from the Trust goes to Mr. and Ms. Lillmars, and then after they both die, the corpus will be split and go equally to National Jewish Center and Catholic Charities.

5. The Trust initially held a piece of real estate that Mr. Lillmars had bought in the Denver Tech Center.

6. In June 2003 the Trust sold the real estate, and respondent represented the Trust in that transaction. The Trust received about $317,000 from that sale.

7. By the time the real estate transaction closed, respondent Linville had become the trustee of the Trust.

8. Respondent deposited all of the $317,000 from the real estate sale into an account at the Denver Public Schools Credit Union.

9. The day after respondent Linville deposited those funds, he withdrew $6,000 in cash from the Trust account for his own personal use.

10. About 4 weeks later, on June 30, 2003, respondent Linville had a check in the amount of $3,300 written on the Trust account payable to Cherry Creek Mortgage to make a payment on a house that he owned in Highlands Ranch.

11. The respondent made other withdrawals from the Trust all for his own personal use.

12. In summary, by July 14, 2003, respondent Linville used about $73,000 of the Trust's money for his own purposes.

13. Of the $73,000.00, he used about $19,900 to buy a 1986 Mercedes from Valley Motors.

14. Respondent also took money from the Trust and deposited it in his firm operating account and in his children's trusts.

15. With regard to the funds deposited in his children's trusts, respondent stated that he invested them in stocks and mutual funds for the benefit of his children.

16. On July 11, 2003, there was a meeting about how to invest the Lillmars Trust money. At the meeting were Mr. Lillmars, respondent Linville, Albert Woodward, an investment advisor and Roseanne Masters. Ms. Master is an accountant who was assisting Mr. and Ms. Lillmars.

17. It was decided at the July 11 meeting to invest $300,000 into a real estate invest-

ment trust. At the time of the meeting the Trust had a balance of about $267,000 after all of respondent's transfers out for his own benefit. Respondent never disclosed his taking money from the Trust or the balance in the Trust account at that meeting.

18. Three days later, on July 14, 2003, respondent caused the $19,900 to be sent to Valley Motors for his Mercedes, and he also took out $1,000 in cash.

19. The next day, on July 15, 2003, respondent Linville caused about $58,000 to be deposited back into the Lillmars Trust account. After that deposit the Trust had $303,143, and the investment in the REIT was done the next day.

20. Respondent still owed about $15,000 plus interest to the Trust as of July 16, 2003.

21. In March of 2004, Ms. Masters began preparation of the Trust tax return.

22. She learned that respondent had taken cash withdrawals from the Trust.

23. Ms. Masters and Greg Lillmars, the son of Mr. and Ms. Lillmars, met with respondent in May 2004.

24. At that meeting in May 2004, respondent said that he had made a mistake in taking the funds. He stated that he tried to correct it by putting money back into the account. Respondent stated to them that he was using the wrong account, and that when he realized that he was not supposed to be using that account he replaced the money.

25. At the May 2004 meeting, respondent gave Ms. Masters and Mr. Lillmars a post-dated check for $15,486.38.

26. Respondent Linville also told Mr. Woodward, the investment advisor, that respondent's taking the money from the Trust was a mistake. They discussed this situation on or about July 1, 2004.

27. In his written response to the request for investigation the respondent stated to the Office of Attorney Regulation Counsel that the money he took out of the Trust for his own benefit was a loan from the Lillmars Trust. He did not state that his taking the money from the Trust was a mistake.

28. The respondent also stated to the Office of Attorney Regulation Counsel that he made a promissory note payable by himself to the Trust on June 5, 2003, in the amount of $74,000. He produced a copy of the purported note which states that it is payable in annual installments beginning May 1, 2004; however, there is no due date for payment in full. There is no statement in the note as to what amount the annual installments would be. The respondent stated that he intended to pay the note on July 15, 2003, and that he should have included that as the due date.

29. The note was not secured in any fashion. The respondent stated that it probably was not prudent to fail to have security.

30. Respondent Linville stated that he paid the $74,000 note off on July 15, 2003, by paying the $58,000 into the Trust and by his executing another promissory note payable to the Trust in the amount of about $15,000. He produced a copy of that second note which similarly has no due date and calls for annual payments that were to begin July 1, 2004.

31. The respondent never discussed his taking money out of the Trust for his own benefit with anyone at the time he took the money.

32. The respondent stated that before he took the money from the Trust, he realized that he would need some cash during a 45–day period. He determined that he would need about $74,000 because he had "outlined" that amount.

33. The respondent did not have the authority to use trust funds for his own personal purposes.

34. The respondent engaged in conversion of Trust funds to his own use. His doing so was a violation of Colo. RPC 8.4(c) (it is misconduct for an attorney to engage in conduct involving dishonesty).

35. Further, the respondent's statements to the Office of Attorney Regulation Counsel that he loaned himself money from the Trust were dishonest in violation of Colo. RPC 8.4(c) as were the documents he produced to support those statements.

WHEREFORE, the complainant prays at the conclusion hereof.

## CLAIM II

### [Conflicts of Interest As An Alternative Claim Pursuant To Colo. RPC 1.7(b) and 1.8(a) ]

36. The factual allegations in paragraphs 1 through 35 are incorporated herein as if fully set forth.

37. The complainant sets forth in this Claim II an alternative claim to Claim I.

38. If the respondent did actually make loans to himself as he claims, but as disputed by complainant, then he violated various Rules of Professional Conduct involving conflicts of interest.

39. When respondent Linville borrowed money from the Trust, he was the sole trustee of and attorney for the Trust.

40. He was also the borrower on the other side of the loan transactions. His obligation to provide conflict free representation to the Trust was directly adverse to his own interests as borrower from the Trust.

41. The respondent drafted the notes which established legal rights and obligations for himself and for his client the Trust.

42. Respondent violated Colo. RPC 1.7(b) in both loan transactions because his personal interests materially limited his representation of the Trust. There never was any client consent to these conflicts of interest by a disinterested attorney or person, nor could there have been because the conflicts of interest could not be waived under Colo. RPC 1.7(c).

43. Respondent also violated Colo. RPC 1.8(a) because he entered into business transactions with a client, the Trust, without complying with all the terms of that rule, including providing the necessary disclosures and obtaining independent counsel to review the transaction. Furthermore, the transactions were not fair to the client Trust because the notes did not adequately state the terms of the transactions, and the notes were not secured.

WHEREFORE, the people pray that the respondent be found to have engaged in misconduct under C.R.C.P. 251.5 and the Colorado Rules of Professional Conduct as specified above; the respondent be appropriately disciplined for such misconduct; the respondent be required to take any other remedial action appropriate under the circumstances including restitution; and the respondent be assessed the costs of this proceeding.