**The PEOPLE of the State of Colorado, Complainant.**

**v.**

**Royal DANIEL, III, Respondent.**

**Nos. 07PDJ026, 07PDJ047.**

Office of the Presiding Disciplinary Judge of the Supreme Court of Colorado.

March 17, 2008.

## REPORT, DECISION, AND ORDER IMPOSING SANCTIONS PURSUANT TO C.R.C.P. 251.19(c)

### I. ISSUE

Disbarment is the presumptive sanction when a lawyer knowingly converts client or third-party funds and causes serious or potentially serious injury. Respondent knowingly converted sizeable amounts of third-party funds while serving as a qualified intermediary in § 1031 tax-deferred real estate exchanges. He later disappeared and failed to participate in these proceedings. Is disbarment the appropriate sanction in this case?

*SANCTION IMPOSED:* **ATTORNEY DISBARRED**

### II. PROCEDURAL HISTORY AND FACTUAL BACKGROUND

The People filed a complaint in 07PDJ026 on June 11, 2007, and in 07PDJ047 on July 23, 2007. Respondent failed to file an answer in either of the cases and the Court granted motions for default on October 2, 2007. The Court also consolidated 07PDJ047 into 07PDJ026 on October 2, 2007. Upon the entry of default, the Court deems all facts set forth in the complaints admitted and all rule violations established by clear and convincing evidence. *People v. Richards,* 748 P.2d 341, 346 (Colo.1987).

The Court hereby adopts and incorporates by reference the factual background of this case fully detailed in the admitted complaints.[1] Respondent took and subscribed the oath of admission and gained admission to the Bar of the Colorado Supreme Court on September 23, 1994. He is registered upon the official records of the Colorado Supreme Court, Attorney Registration No. 24389, and is therefore subject to the jurisdiction of the Court.

### Beaty Matter

Wendy and Stacy Beaty contacted Respondent in late March 2007 to determine whether he would act as a qualified intermediary in their potential § 1031 tax-deferred real estate exchange on the sale of their condominium. Respondent told the Beatys via e-mail that he would mail them a written exchange agreement to act as their qualified intermediary. Respondent never sent an agreement to the Beatys.

On April 12, 2007, unbeknownst to the Beatys, Respondent sent e-mail to Jennifer Farrell from Land America, the title company that held the Beatys' proceeds. Respondent told Ms. Farrell that he had signed an agreement with the Beatys to receive said funds on their behalf as a qualified interme-

---

1. *See* the People's complaints in 07PDJ026 and 07PDJ047.

diary. This statement was false and Respondent knew it was false at the time he made it.

On April 27, 2007, Land America advised the Beatys that Land America had already wire-transferred the Beatys' proceeds, $80,303.10, to Respondent based on his statement. Respondent therefore knowingly exercised unauthorized dominion or ownership over funds belonging to the Beatys for his own purposes.

The Beatys thereafter contacted the Breckenridge Police Department on or about May 4, 2007, and spoke with Sergeant Susan Quesada. Sergeant Quesada informed them of an ongoing criminal investigation into Respondent's conduct, and that a review of his bank account records revealed that the escrow account no longer held their money.

The Breckenridge Police Department, with the assistance of Certified Public Accountants, conducted a financial investigation into Respondent's bank accounts. They found Respondent had ten accounts at U.S. Bank totaling $3,971.51 in funds, and three accounts at Alpine Bank totaling $229,820.67 in funds. While these accounts contain more funds than actually owed to the Beatys, the investigation nevertheless demonstrated that based on other documented claims, Respondent should have been holding at least $561,571.25 in trust.

The Court therefore concludes that Respondent's knowing conduct in the Beaty matter caused the Beatys actual harm and violated Colo. RPC 8.4(b) (criminal act reflecting on honesty, trustworthiness, or fitness in other respects), Colo. RPC 8.4(c) (dishonest statement), Colo. RPC 8.4(c) (knowing conversion) and C.R.C.P. 251.5(b).

*Gregory Matter*

In 2006, Respondent agreed to provide qualified intermediary services for Gene Gregory and thereafter assisted Mr. Gregory with a § 1031 property exchange. As a part of that agreement, Respondent held over $250,000.00 in trust on behalf of Mr. Gregory. At the time Mr. Gregory needed to receive the $250,000.00, Respondent could not provide the funds because he had used them. Respondent thereafter gave Mr. Gregory

"the run around," before he eventually admitted to Mr. Gregory that he had used Mr. Gregory's funds to repay § 1031 funds he had used belonging to other people. He also admitted to Mr. Gregory during this time that he was $300,000.00 in debt.

Respondent eventually repaid Mr. Gregory most of his $250,000.00. However, Respondent still knowingly exercised unauthorized dominion or ownership over funds belonging to Mr. Gregory for his own purposes over a period of time. The Court therefore concludes that Respondent's knowing conduct in the Gregory matter caused Mr. Gregory actual harm and violated Colo. RPC 8.4(c) (knowing conversion).

*Miller Matter*

Jacob Miller and his wife are personal acquaintances of Respondent who had a prior attorney-client relationship with him in a real estate matter. In early July 2006, the Millers completed construction of a house in Breckenridge. They then listed the house for sale, and three days later, received an offer to purchase that house.

The Millers spoke to Respondent about the sale of this house. Respondent described numerous tax benefits of a § 1031 tax-deferred exchange, and suggested that they hire him as their qualified intermediary for the exchange. On July 13, 2006, Mr. Miller and the Daniel Law Firm entered into a written "exchange agreement" in which Respondent agreed to act as the qualified intermediary for the property exchange.

On July 21, 2006, the closing occurred on the first property ("relinquished property"). At that closing, Respondent received a check in the amount of $776,033.45. Respondent was required to hold these funds in trust on behalf of the Millers until the completion of the exchange. Respondent assured the Millers that this money would earn a good interest rate for them in a local Alpine Bank account.

The Millers thereafter located two replacement properties for the exchange. Respondent attended the closings and provided the funds for the purchase of the two replacement properties. After purchasing these two

properties, the Millers still had $171,000.00 remaining in Respondent's trust pursuant to this tax-deferred exchange. These remaining funds had been designated for startup building costs and for the Millers' 2007 taxes.

In early April 2007, the Millers received e-mail from their accountant in Frisco, Colorado, notifying them that they needed to send the Internal Revenue Service ("IRS") $42,186.00 and the State of Colorado $8,911.00. The Millers promptly forwarded the e-mail to Respondent and requested that he transfer these amounts into their personal account. Respondent sent the Millers e-mail and notified them that he would do so. Based upon Respondent's assurances, the Millers wrote checks to the IRS and the State of Colorado.

On April 26, 2007, Respondent advised the Millers via e-mail of some confusion with regard to the wire-transfer and thus, the wire-transfer had been returned to him. Respondent then offered to wire-transfer the funds into another personal account, but thereafter failed to do so.

On April 27, 2007, Respondent disappeared. The same day, the Millers were notified that their checks to the IRS and the State of Colorado had bounced. Respondent failed to return any of the remaining funds held in trust on behalf of the Millers. He therefore knowingly exercised unauthorized dominion or ownership over funds belonging to the Millers for his own purposes. The Millers state that they are now receiving threats of foreclosure on their personal residence, that they have no startup money for any future building on the two replacement lots, and that they may have to pay capital gains taxes on the Breckenridge property.

The Court therefore concludes that Respondent's conduct in the Miller matter caused the Millers actual harm and violated Colo. RPC 8.4(b) (criminal act reflecting on honesty, trustworthiness, or fitness in other respects), Colo. RPC 8.4(c) (knowing conversion) and C.R.C.P. 251.5(b).

*Newkirk Matter*

Mark and Susan Newkirk hired Respondent to act as a qualified intermediary in a § 1031 tax-deferred real estate exchange. On October 30, 2006, the Newkirks sold their first property ("relinquished property") in Breckenridge, Colorado. The same day, Land America Title issued a check for $205,305.28 to the Daniel Law Firm. Respondent was required to hold these funds in trust on behalf of the Newkirks until the completion of the exchange.

In February 2007, Mr. Newkirk called Respondent to inform him of their plans for the replacement portion of the property exchange. The Newkirks discussed an April 2007 closing date. Respondent assured the Newkirks that there would be "no problem" in meeting their April 2007 deadline. When the Newkirks asked what they needed to do, Respondent told them that they only needed to tell him where to send the money when they were ready for it. When the Newkirks asked about the time limits on the § 1031 exchange, Respondent told them to remind their accountant to file an extension on their tax return since the closing would occur after the IRS filing deadline.

As part of the closing document requirements for the replacement property, the Newkirks submitted a standard mortgage form to Respondent entitled, "Request for Verification of Deposit." Respondent completed and signed this form on April 4, 2007. In the form, Respondent verified that he continued to hold $205,305.28 in trust on behalf of the Newkirks in "account number 06–503."

On April 8, 2007, Mr. Newkirk called Respondent and told him that the closing on the replacement property would be held on April 25, 2007. Respondent reassured them that there would be no problem. On April 19, 2007, and over the next few days, Mr. Newkirk called and left several messages for Respondent. Respondent failed to return any of these phone calls. On April 25, 2007, Respondent's receptionist called and stated that she had given Respondent all of the Newkirks' messages, but that he had been "very busy." Mr. Newkirk gave the receptionist the bank account and routing numbers Respondent would need in order to send the money.

Respondent failed to transfer the money needed to close on the replacement property. As stated above, he disappeared on April 27, 2007. Respondent also failed to return any of the funds held in trust on behalf of the Newkirks. He therefore knowingly exercised unauthorized dominion or ownership over funds belonging to the Newkirks for his own purposes.

The Court therefore concludes that Respondent's conduct in the Newkirk matter caused the Newkirks actual harm and violated Colo. RPC 8.4(b) (criminal act reflecting on honesty, trustworthiness, or fitness in other respects), Colo. RPC 8.4(c) (knowing conversion) and C.R.C.P. 251.5(b).

### III. SANCTIONS

■ The ABA Standards for Imposing Lawyer Sanctions (1991 & Supp.1992) ("ABA Standards") and Colorado Supreme Court case law are the guiding authorities for selecting and imposing sanctions for lawyer misconduct. *In re Roose,* 69 P.3d 43, 46–47 (Colo.2003). In imposing a sanction after a finding of lawyer misconduct, the Court must first consider the duty breached, the mental state of the lawyer, the injury or potential injury caused, and the aggravating and mitigating evidence pursuant to ABA *Standard* 3.0.

Respondent's failure to participate in these proceedings leaves the Court with no alternative but to consider only the established facts and rule violations set forth in the complaints in evaluating the first three factors listed above. The Court finds Respondent violated duties owed to the public and the legal system. Respondent specifically violated his duty to preserve the property of the third-party individuals who hired him and failed to maintain his personal integrity by acting dishonestly and engaging in felonious criminal conduct. The entries of default established that Respondent *knowingly* engaged in this conduct and caused significant actual harm to these individuals.

The Court finds several aggravating factors exist in this case including a dishonest or selfish motive, a pattern of misconduct, multiple offenses, substantial experience in the practice of law, indifference to making restitution, and illegal conduct. *See* ABA *Standards* 9.22(b), (c), (d), (i) and (j). Due in part to the absence of any contradictory evidence, the Court finds clear and convincing evidence to support each aggravating factor. Respondent failed to participate in these proceedings and therefore presented no evidence in mitigation. However, the People acknowledge Respondent has no prior disciplinary record. *See* ABA *Standards* 9.32(a).

■ The ABA *Standards* suggest that the presumptive sanction for the misconduct evidenced by the admitted facts and rule violations in this case is disbarment. Disbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client. ABA *Standard* 4.11. However, the Colorado Supreme Court makes no distinction between theft from a client and theft from a third-party when Respondent acts in a position of trust. *See e.g. People v. Linville,* 114 P.3d 104 (Colo.2005) (attorney acting as trustee); *People v. Motsenbocker,* 926 P.2d 576 (Colo. 1996) (attorney acting as bar association treasurer); and *People v. McDowell,* 942 P.2d 486 (Colo.1997) (attorney holding funds for real estate transaction).

■ Colorado Supreme Court case law applying the ABA *Standards* holds disbarment is the presumptive sanction for conversion of client or third-party funds. Knowing conversion or misappropriation of client money "consists simply of a lawyer taking a client's money entrusted to him, knowing that it is the client's money and knowing that the client has not authorized the taking." *People v. Varallo,* 913 P.2d 1, 11 (Colo.1996). Neither the lawyer's motive in taking the money, nor the lawyer's intent regarding whether the deprivation is temporary or permanent, are relevant for disciplinary purposes. *Id.* at 10–11. Significant mitigating factors may overcome the presumption of disbarment, however, none are presented in this case. *See In re Fischer,* 89 P.3d 817 (Colo.2004) (finding significant facts in mitigation).

Respondent knowingly converted sizeable amounts of third-party funds while serving as a qualified intermediary in § 1031 tax-deferred real estate exchanges. His use and

failure to return these funds warrants disbarment. Respondent's complete failure to participate in these proceedings further precludes any deviation from the presumptive sanction.

## IV. CONCLUSION

One of the primary goals of our disciplinary system is to protect the public from lawyers who pose a danger to them. The facts established in the complaint, without explanation or mitigation, reveal the serious danger Respondent poses to the public. He knowingly converted sizeable amounts of third-party funds and caused significant actual harm to these individuals. This misconduct adversely reflects on his fitness to practice law. Absent extraordinary factors in mitigation not presented here, the ABA *Standards* and Colorado Supreme Court case law applying the ABA *Standards* both support disbarment. Upon consideration of the nature of Respondent's misconduct, his mental state, the significant harm and potential harm caused, and the absence of mitigating factors, the Court concludes there is no justification for a sanction short of disbarment.

**2.** The People set forth amounts of $80,303.10 owed to the Beatys, over $250,000.00 owed to Mr. Gregory, $171,033.45 owed to the Millers, and $205,305.28 owed to the Newkirks in their complaints. The People concede Respondent

## V. ORDER

The Court therefore **ORDERS:**

1.  ROYAL DANIEL, III, Attorney Registration No. 24389, is hereby **DISBARRED** from the practice of law, effective thirty-one (31) days from the date of this order, and his name shall be stricken from the list of attorneys licensed to practice law in the State of Colorado.

2.  ROYAL DANIEL, III, **SHALL** pay full restitution with statutory interest to each injured third-party or to the Attorney's Fund for Client Protection for any amounts reimbursed by the fund.[2]

3.  ROYAL DANIEL, III, **SHALL** pay the costs of these proceedings in the amount of $1,805.80 within thirty (30) days of the date of this order.

eventually repaid Mr. Gregory "most" of his $250,000.00. The actual amount owed to the Millers is unclear because the People allege an amount of $144,458.04 owed to the Millers in their sanctions hearing brief.